## Little v. Hazlett.

*Married women—Partnership—Acts of April* 11, 1848, *and June* 3, 1887.

The personal responsibility that partners take upon themselves, when they become a member of a partnership, to meet its obligations out of their means other than that which they have contributed to the partnership, cannot be enforced against a married woman, where the contract was made under the common law as modified by the act of April 11, 1848, and before the act of June 3, 1887, was passed.

*Partnership—Dissolution—Death—Marriage—Notice.*

By operation of law, a partnership is dissolved when one of the partners dies, and also when a female partner marries, and creditors are presumed to have notice of such dissolution.

Argued Oct. 15, 1900. Appeal, No. 35, Oct. T., 1900, by plaintiff, from order of C. P. Washington Co., Feb. T., 1899, No. 242, refusing to take off nonsuit, in case of John H. Little v. Robert W. Hazlett, Mary E. Brown, Margaret Grayson and Samuel Hazlett, partners, doing business under the name and style of Samuel Hazlett. Before McCOLLUM, C. J., MITCHELL, FELL, BROWN, MESTREZAT and POTTER, JJ. Affirmed.

Assumpsit on certificate of deposit.

At the trial the court entered a compulsory nonsuit which it subsequently refused to take off, McILVAINE, P. J., filing the following opinion:

### THE FACTS OF THE CASE.

1. Samuel Hazlett, one of the defendants, who had had some previous experience with his deceased father as a banker, on January 1, 1866, opened a private banking house in Washington, Pa. He had associated with him, under an agreement which

was in writing, dated November 27, 1865, as silent partners, Sarah Hazlett, his mother (a widow), Robert W. Hazlett, his brother, and his three sisters who, at the time the agreement was signed, were Margaret Hazlett (single), Mary E. Hazlett (single) and Sarah H. Vowell (married). The contract of partnership was in words and figures as follows, to wit:

" Articles of agreement made and concluded the 27—days of November A. D. 1865, between Mrs. Sarah Hazlett of Washington Penna—Dr. R. W. Hazlett of Wheeling West Virginia Margaret Hazlett and Mary E. Hazlett of Washington Pa— S. B. Vowell and Sarah H. Vowell of Chicago, Illinois and Samuel Hazlett of Washington Penna—

" The said parties have agreed and by these presents do agree to become copartners together in the Banking and Exchange business, and all things properly and ordinarily belonging thereto ; which said copartnership it is agreed shall commence on the first day of January 1866 and shall continue for and during the full term of Ten years from that date, at which time the same shall be fully completed and ended—and to that end and purpose, each of the said parties, agree to pay in as stock on the                               the sum of Six thousand dollars, with the privilege on the part of the said R. W. Hazlett and Samuel Hazlett or any other of the stockholders, of increasing their shares of the capital stock to any extent they may deem proper at any time during the continuance of the said copartnership, the same to be used, laid out and employed in the said business for the benefit and advantage of the said parties—

" And it is hereby agreed between the said parties, that the said Samuel Hazlett shall have the sole and exclusive management and control of the said copartnership business during the whole of the said term of Ten years—and in consideration therefor it is agreed that the said Samuel shall receive a salary of Twelve Hundred Dollars per annum for his services, in addition to his share of the profits to be derived from the partnership business—

" It is also agreed, that in case any one of the parties should die during the term of the said partnership (except the said Samuel) such death shall not work a dissolution of the same, but the same shall continue during the full term thereof, and the

said Samuel Hazlett is hereby constituted the representative of any one of the said parties who may die during the said term, with full power to manage the interests of such deceased partner during the whole of the said term, without the interference of any person; but without extra compensation.

"It is further agreed by the said parties that there shall be had and kept from time to time and at all times during the term of said copartnership, perfect, just and true books of accounts wherein the said Samuel Hazlett shall duly enter an.c. set down all matters and things whatsoever pertaining to the said copartnership business, to which books of accounts either of the parties may have free access at any time they may think proper—

"It is also agreed that the said Samuel Hazlett shall on the first days of January and July of each year make a full and perfect Exhibit, in writing, of all profits and increase made during the preceding six months, and of all losses sustained, and also of all payments, receipts, disbursements and all other things whatsoever pertaining to the said business, and shall pay to each of the said parties their equal shares of the profits so made, after first deducting therefrom his salary as aforesaid. Whatever losses may be sustained in the said business shall be borne in proportion to the interests of the several parties—

"It is further agreed that the said Samuel Hazlett may at any time withdraw from the said copartnership business when he desires so to do—by giving the other stockholders a written notice of his intentions at least one year before his withdrawal.

"And at the end of the said ten years (or upon the withdrawal of the said Samuel) the said Samuel Hazlett shall make a true, just and final account of all things as aforesaid, and divide the profits thereof, and in all things well and truly adjust the same, and also upon the making of such final account, all and every the stock and stocks as well as the gains and increase thereof which shall appear to be remaining, whether consisting of money, debts, notes, bonds, &c.—shall be parted and divided amongst the said copartners in proportion to their several interests in the same—

"Witness our hands and seals the day and year first before written—

"It is further agreed by the stockholders that the deposit ac-

count in this business shall not exceed Fifty Thousand dollars and should S. Hazlett advise or require its increase, the stockholders are to be advised and their consent thereto obtained, before the amt. is increased.

" Should the stockholders conclude at any time to increase their stock, S. Hazlett is to receive thereafter $1,500 instead of $1,200.

" All erasing and interlining in the above agreement was made before our signatures were affixed thereto. Witness our hands and seals."

2. Samuel Hazlett had sole and exclusive control of the business, and the bank was known as Samuel Hazlett's bank. From January 1, 1866, to April 1, 1881, the business was conducted in a building owned by the partners and inherited by them from Samuel Hazlett, Sr., who died November 7, 1863. After April 1, 1881, and up to March 19, 1898, when the bank was closed, the business was conducted in a building erected and owned by Samuel Hazlett individually. On March 31, 1898, Samuel Hazlett made a general assignment for the benefit of creditors, by virtue of which all the assets of the bank went into the hands of his assignees, and the assigned estate is now in process of settlement.

3. Mrs. Sarah Hazlett, the mother, died December 10, 1873; Mary E. Hazlett married Joseph Brown, December 21, 1865, and she and her husband are both still living ; Sarah H. Vowell, who married Stewart B. Vowell, September 22, 1859, died on July 7, 1886, and was buried in the Washington, Pa., cemetery, her husband is still living; Margaret Hazlett married Dr. Wray Grayson, of Washington, Pa., December 27, 1877, and lived with him in Washington, Pa., until January 00, 1899, when he died. Robert W. Hazlett, who had for many years lived in Wheeling, W. Va., died at his home since this suit was instituted. Mrs. Brown and her husband have lived in Pittsburg, Pa., for many years, and Mrs. Vowell and her husband lived in Chicago, Ill.

4. Up to July 1, 1877, the profits and losses of the banking business were divided between the partners every six months, as provided in the partnership agreement, and Samuel Hazlett charged up his salary as part of the expenses of the concern. After that date all the profits were taken and

credited to Samuel Hazlett individually, and he drew no salary, as is shown by his "profit and loss account book." Presumably all the partners except Samuel Hazlett withdrew from the business and firm at or about that time, but there is nothing in the plaintiff's case that shows that an actual settlement between the partners was made then or at any subsequent time.

5. From March 2 to October 18, 1897, at different dates, John H. Little deposited in the bank sums of money aggregating over $21,000, and took from Samuel Hazlett therefor certificates of deposit in the form following:

" $3,000.      BANKING OFFICE OF SAMUEL HAZLETT,
                    " Washington, Pa., March 18th, 1897.

" John H. Little has deposited in this office Three Thousand Dollars payable to the order of himself on return of this certificate properly indorsed 12 months from date with interest at the rate of 4 per cent. per annum.  Thirty days' notice to be given of an intention to withdraw this deposit.  Interest to cease at maturity.

                              " SAM HAZLETT."

On the 10th day of January, 1899, he brought this suit to recover from the four defendants named, the amount of these certificates.  Robert W. Hazlett having died since the suit was brought, the jury was sworn as to the three remaining defendants.

6. John H. Little in 1866 had a conversation with Samuel Hazlett in which he was told by Samuel Hazlett that he and his brother and sisters had gone into the banking business, and was then solicited to open an account with them.  Again, some time between 1866 and 1872, in another conversation with Samuel Hazlett, the same information was given him.  In 1872 Mr. Little opened an account in the bank and was one of its patrons from that time until it closed.  He never had any conversations with either Mrs. Grayson or Mrs. Brown, and was never given any actual notice that the firm had been dissolved.  He knew of the marriage of Margaret Hazlett to Dr. Wray Grayson, and knew that Mrs. Brown was a married woman, but did not learn of the death of Mrs. Vowell until lately, and never knew that Mrs. Hazlett was a member of the firm.  He was not told by Samuel Hazlett that the partnership

was to terminate at the end of ten years, and did not know that the partnership contract was in writing until shortly before he brought this suit. During the twenty years between 1877 and 1897 when he did business with the bank and made deposits therein, he gave no thought to the fact that Margaret Grayson and Mary E. Brown were or had been partners, or that their marriage or their being members of the firm in any way affected his security as a depositor.

### THE LAW OF THE CASE.

1. Let us inquire into the nature of a partnership contract, and the relation a firm and the individual members of a firm sustain to its creditors.

"Partnership is a contract of two or more persons to place their money, effects, labor and skill or some or all of them in lawful commerce or business and to divide the profits and bear the loss in certain proportions." "The two leading principles of the contract are a common interest in the stock of the company and a personal responsibility for the partnership engagements." 3 Kent's Commentaries, 24. If a firm makes a contract whereby it becomes indebted to a stranger to the partnership, the result is that not only the property of the firm, but the separate estate of each individual member of the firm can be taken to satisfy the firm creditor. Each individual member of a firm in a sense is its surety, and assumes a personal responsibility for its engagements when he or she enters into the partnership contract. Hence, as stated in Story on Partnership, "persons who enter into the partnership shall be of sound mind, sui juris and capable of making contracts."

The case at bar is an illustration of this principle. Samuel Hazlett, the active member of the firm, that it is alleged he represented when he made the certificates sued upon, prior to the time the suit was instituted made a general assignment for the benefit of creditors and turned over all the assets of the bank, including its entire capital stock, to his assignees. John H. Little, the creditor holding these certificates, believing that the assets of the bank would not pay him and the other creditors in full, brought this suit to enforce his claim against the individual members of the firm and to take in execution the property that belongs to them individually. It is not a suit

prosecuted for the purpose of taking in execution the property of the alleged partnership, that is already in the hands of the law; it is the separate estate of these two married women that he is after, and he can only succeed upon the assumption that their contract to be personally responsible for the engagements of the firm is valid and binding upon them.

That brings us to the second question, and that is, could a married woman make a partnership contract in Pennsylvania prior to the passage of the Act of June 3, 1887, P. L. 332, so as to make her personally responsible for the firm's engagements?

In considering this question we must be careful to properly limit the scope of our inquiry. It may be conceded that a married woman's contract of partnership will, under certain circumstances, be sustained. Neither the party or parties with whom she contracts, nor strangers to the contract, can set up her disability to her disadvantage and to their own gain. The rule which incapacitates a married woman from entering into a contract is for her benefit and protection.

In Silveus's Executors v. Porter, 74 Pa. 448, the creditors of the husband of a married woman who was a member of a partnership undertook to take her property to pay his debts. The Supreme Court held that what was earned for her under the contract of partnership was the property of the wife, and not liable for the husband's debts. The contest was between the wife and her husband's creditors, and clearly they could not set up her disability to make a partnership contract.

In Endlich & Richards on the Rights and Liabilities of Married Women, at sec. 111, cited by the learned counsel for the plaintiff in support of their claim that a married woman could enter into a partnership contract, the authors recognize the distinction between a married woman enforcing her rights under a partnership contract against her husband's creditors, and third parties enforcing their claims against her under such a contract. In the last paragraph of the section they say: "But whether she can be held under her covenant of partnership to the ordinary liabilities of partners is another question."

Again, it may be conceded that the money contributed by a married woman to the capital stock of a firm of which she is a member, as well as her share of the undistributed profits, if

they pass to an assignee for the benefit of the creditors of the firm under an assignment made by a member of the firm authorized to make such an assignment, will go to the creditors and cannot be claimed by her on the ground that the partnership contract was void by reason of her coverture; or it may be conceded that a copartner of a married woman, under the right of each partner to apply firm assets to the payment of its liabilities, may subject the joint or firm property to levy and sale in discharge of partnership indebtedness by giving a judgment note therefor in the name of the firm, and thus take from her on her partnership contract the money she put into the capital stock of the firm, and that she would not be allowed in equity and good conscience to have such a judgment set aside; but these concessions as to the rights and limited liability of a married woman under a contract of partnership into which she has entered are not decisive of the question before us, namely, is a married woman who is a member of a partnership, as Chancellor Kent puts it, supra, "personally responsible for partnership engagements."

Under the facts in this case, the law to which we must look for a solution of this question is the common law as modified by our act of April 11, 1848, relative to the rights of married women. The contract dated November 27, 1865, fixed the term of the partnership at ten years from January 1, 1866. If, on January 1, 1876, it was agreed by and between the partners to continue the partnership and it was not by reason of that agreement terminated at that time, then the agreement thus entered into by Mary E. Brown would be an agreement entered into by a married woman, and her liabilities would be fixed as of that date. If the partnership was still in force on December 27, 1877, the date of Margaret Hazlett's marriage to Dr. Grayson, it would be dissolved by her marriage, and unless after her marriage it was agreed to continue it, it was not in existence when this suit was brought; and if after her marriage she agreed to continue it, then her contract and how it would be affected by the fact that she was a married woman would be adjudged under the law as it stood at the time of her marriage, December 27, 1877.

Again, if the partnership had by the agreement of the parties been extended beyond the period of ten years from 1866, and

was in existence on July 7, 1886, it was then dissolved by the death of Sarah H. Vowell; and in 1897, when the certificates sued on were made, Mrs. Mary E. Brown and Mrs. Margaret Grayson were not partners of Samuel Hazlett, unless on July 7, 1886, after the death of Mrs. Vowell they, Samuel and Robert, agreed to continue the partnership, and at that date a married woman's rights and disabilities were fixed by the common law as modified by the act of 1848. To repeat: the partnership proven by the plaintiff terminated by its own term January 1, 1876; if then continued by agreement, it was again terminated by the marriage of Margaret Hazlett, December 27, 1877; if then again continued by agreement, it was again terminated by the death of Mrs. Sarah H. Vowell, July 7, 1886; and if it was in existence in 1897, it was again continued by the agreement of the parties after Mrs. Vowell's death. On January 1, 1876, December 27, 1877, and July 7, 1886, Mary E. Brown was a married woman, and on December 27, 1877, and on July 7, 1886, Margaret Grayson was a married woman.

Now, let us see what was the law as to the liabilities of married women before the passage of the act of June 3, 1887 : " At common law generally all contracts, agreements, covenants, promises and representations of married women were absolutely null and void at law and in equity. The grounds of their invalidity were that a married woman had no legal existence, being merged in her husband, and that she had no consenting capacity, as she was under the power and control of her husband and his wish was her law. The common-law rule . . . . still so far exists that any capacity of a married woman to contract is regarded as exceptional, and the ground thereof must be alleged and proved by one setting it up:" 14 Am. & Eng. Ency. of Law, 604.

The disqualifications which the common law imposes upon a wife are for her benefit and protection. Marriage places her sub potestate viri. Her will is no longer free, but subject to constraint, and hence her power to contract is necessarily suspended during coverture : Heugh v. Jones, 32 Pa. 433.

It is a mistaken supposition that the act of 1848 was intended to take away any of the safeguards which the law had previously thrown around her property. Her right to use and enjoy is

enlarged, but not her power of disposition: Glyde v. Keister, 32 Pa. 85.

The act of 1848 was a great innovation upon the common law, but its purpose was to secure a wife in the use and enjoyment of her property, not to enable her to make contracts she could not have made before. There is nothing in it which expressly removes her common-law disability to contract: Brunner's Appeal, 47 Pa. 67.

A feme covert cannot sustain the character of a partner, because she is legally incapable of entering into the contract of partnership: Collyer on Partnership, sec. 14.

A married woman is by the common law incapable of making a contract that will bind her personally, either in law or equity, and for this reason there can be no personal judgment or decree against her: Bank v. Partee, 99 U. S. 325; Story on Partnership, sec. 10; Parson on Partnership, p. * 23.

Prior to 1879 a married woman could not assume the obligations of a stockholder in a building association conducted under the act of 1859: Wolbach v. Lehigh Bldg. Assn., 84 Pa. 211; Tanner's Appeal, 95 Pa. 118; Juniata Bldg. & Loan Assn. v. Mixell, 84 Pa. 313.

This brings us to a third question of law involved in the matter before us for decision, and that is the dissolution of a partnership by operation of law.

The marriage of a feme sole partner operates as a dissolution of the partnership; because her capacity to act ceases and because she becomes subject to the control of her husband: 3 Kent's Comm. 55.

The marriage of a feme sole partner will, at the common law, create a dissolution of the partnership by mere operation of law, for, in the first place by the marriage, all her personal property and effects are transferred to and belong to her husband in his own right . . . . and in the next place the marriage creates a positive, personal incapacity on her part any further to enter into or bind herself by any contract: Story on Partnership, sec. 306.

If a single woman who is a partner marries, her marriage operates at common law an immediate dissolution . . . . And even if by some valid contract (and we might add, or statutory enactment) the marriage leaves her property under her control,

she loses by marriage the power of independent personal action in matters of business, and this would suffice to operate as a dissolution : Parsons on Partnership, p. 462.

Marriage of a feme sole partner dissolves the partnership; it is a dissolution ipso facto, and not merely a ground for it: Bates on Partnership, sec. 588.

And it will not be controverted that the death of any partner immediately dissolves a partnership.

Dissolution by marriage and by death are dissolutions by operation of law.

Dissolution by operation of law is of a public and not of a private nature, and is presumed to be taken notice of by every one, and hence, no notice is necessary : 17 Am. & Eng. Ency. of Law, 1118.

We have here to consider only a dissolution by the death of a partner, and this of itself works a dissolution and so entirely that want of notice of it does not affect the making of the estate liable to debts contracted by surviving partners : Caldwell v. Stileman, 1 Rawle, 216.

If we interpret these citations correctly they sustain us in holding :

1. That a contract of partnership imposes upon each partner entering into it a personal obligation to pay the creditors of the partnership if the assets of the firm are not sufficient to meet their demands.

2. That although a married woman might have enforced her rights under a partnership contract into which she had entered as against the creditors of her husband, and although what she might have contributed to the capital stock of the partnership, might have been taken to pay the debts of the firm, yet the personal responsibility that partners take upon themselves, when they become a member of a partnership, to meet its obligations, cannot be enforced against a married woman where the contract was made under the common law as modified by our act of 1848, and before the acts of 1887 and 1893 were passed.

3. That by operation of law a partnership is dissolved when one of the partners dies, and also when a female partner marries, and that creditors are presumed to have notice of such dissolution.

### CONCLUSIONS.

From the law and facts of the case as we have found them, we are of opinion:

1. That the plaintiff has not shown that Margaret Grayson and Mary E. Brown were partners of Samuel Hazlett when he signed the certificate of deposit sued upon; on the contrary the fact that the term of the original partnership was fixed at ten years, which expired January 1, 1876, the fact that Mrs. Sarah Hazlett died in 1873 and Sarah Vowell in 1886, the fact that Mary E. Hazlett married in 1865 and Margaret Hazlett in 1877, the fact that Margaret Grayson never shared in profits and losses after July 1, 1877, and that Samuel Hazlett's "profit and loss" account book shows that after July 1, 1877, he took all the profits and ceased to charge the expense side of the account with the salary that the partnership contract allowed him, the fact that he moved into a building of his own, specially built for banking purposes, in 1881, and for sixteen years occupied it, doing business in his own name, and the fact that he had not spoken to his brother for many years, taken together would support an affirmative finding that Mary E. Brown and Margaret Grayson were not partners with Samuel Hazlett and Robert W. Hazlett in 1897.

2. That the evidence does not show, expressly or by implication, that the plaintiff, John H. Little, had in his mind that Margaret Grayson, Mary E. Brown and Robert W. Hazlett were partners of Samuel Hazlett in 1897, when he received his certificates of deposit, and it does not show that he had a right under the law to presume that they were partners at that time; on the contrary, he was bound under the law and facts as he knew them to presume that the partnership entered into January 1, 1866, was dissolved; and there is no evidence in the case to show that a new partnership had been entered into by the four defendants against whom he has brought suit, or that they ever agreed to continue the business as surviving partners after the death of Mrs. Sarah H. Vowell under this old agreement, or that they ever agreed to continue the business after the dissolution caused by the marriage of Margaret Hazlett in December, 1877; the evidence and the fair and logical inferences that can be drawn therefrom, clearly show that the plaintiff's action is based upon an afterthought; the thought was not present in

his mind when he made his deposits in 1897 that Mrs. Grayson and Mrs. Brown were jointly liable with Samuel Hazlett, but after an unsuccessful effort to get Samuel Hazlett to pay his claim at a heavy discount and after he saw for the first time the written contract of partnership, the thought came to him that thirty years before Samuel Hazlett had told him of these silent partners, and the further thought came to him that he had had no actual notice from Mrs. Grayson and Mrs. Brown that this partnership had been dissolved, upon these two facts, a recollection of which came to him nine months after the bank closed, his suit is evidently founded.

3. That even if Mrs. Grayson and Mrs. Brown did agree to continue the business after the marriage of Margaret Hazlett in 1877, and after the death of Mrs. Vowell in 1886, being then married women, their agreement cannot be enforced against them in this action, the purpose of which is not to reach the firm assets, but to take in execution their individual estate in satisfaction of a personal obligation that arose out of their implied agreement that they would pay the certificates of deposit, which Samuel Hazlett alone signed and which are the basis of this action, if the firm did not pay them.

And now, January 11, 1900, motion to lift compulsory nonsuit refused, exception noted and bill sealed for the plaintiff.

*Error assigned* was the order of the court.

*R. W. Irwin*, with him *John C. Bane*, for appellant.—Prior to the passage of the acts of 1887 and 1893, a married woman could be a partner with any one except her husband, but her separate estate was not liable for the debts of the partnership. Since the passage of the acts of 1887 and 1893, a married woman may contract with reference to her separate estate and business, and may bind herself as fully and completely as if she were not married. It follows, therefore, that she may be a member of a partnership, and that she is personally responsible for all debts created by the partnership of which she is a member: Silveus v. Porter, 74 Pa. 448; Brooks v. Merchants' Nat. Bank, 125 Pa. 394.

If she could be a partner, independent of the question of her personal liability for the debts, then it follows that the marriage of Mrs. Grayson did not dissolve the partnership.

It is claimed, however, that the death of Mrs. Vowell was legal notice to the plaintiff of the dissolution of the firm. We readily concede the general rule that death dissolves a partnership, and that it is notice to all the world, but we maintain that this rule applies only to actions against the estate of the deceased partner; and there is a good reason why the rule should apply in such a case, because the partner is gone and cannot give notice.

Under the act of June 8, 1893, a married woman, who is a member of a partnership, is entitled to the same rights and subject to the same liabilities as any other partner: Loeb v. Mellinger & Co., 12 Pa. Superior Ct. 592.

The evidence shows that the partnership was continued beyond the period of ten years limited in the articles of copartnership. The plaintiff having shown this fact, the presumption is that the partnership continued and the burden was upon the defendants to show a dissolution: Plumer v. Lord, 87 Mass. 460; Bitter v. Rathman, 61 N. Y. 512; Abbott v. Jackson, 43 Ark. 212; Kutcher v. Williams, 40 N. J. Eq. 436; Wieman v. Anderson, 42 Pa. 317; Bates on Partnership, sec. 588; 1 Lindley on Partnership, sec. 84; Vail v. Winterstein, 94 Mich. 230.

The question, whether a married woman could be a member of a partnership prior to the act of 1887, is settled by this court in Brooks v. Merchants' Nat. Bank, 125 Pa. 394.

*D. F. Patterson*, with him *John W. & A. Donnan* and *Henry M. Russell*, for appellees.——The marriage of a female partner dissolves the partnership: Story on Partnership, sec. 306; Parsons on Partnership, 462.

Under the act of 1848, a married woman could not be a member of a partnership: Hemphill v. McClimans, 24 Pa. 367; Bear v. Bear, 33 Pa. 525; Stebbins v. Crawford County, 92 Pa. 289; Heugh v. Jones, 32 Pa. 433; Glyde v. Keister, 32 Pa. 85; Brunner's App., 47 Pa. 67.

Dissolution by operation of law is presumed to be taken notice of by every one. It is of a public not a private nature, and hence no notice is necessary: 2 Bates on Partnership, sec. 610.

Where no time is fixed for its dissolution, either party may

dissolve it at his pleasure, and unless there be an express stipulation to the contrary, it is dissolved by the death of either party: Gratz v. Bayard, 11 S. & R. 41; Shipe's App., 114 Pa. 207; Marlett v. Jackman, 85 Mass. 287; Eustis v. Bolles, 146 Mass. 413.

PER CURIAM, January 7, 1901:

This is an action of assumpsit in which the court below entered a compulsory nonsuit as to defendants Mary E. Brown and Margaret Grayson, and refused on the motion of J. H. Little, plaintiff, to take it off. The result of the trial was a verdict of the jury in favor of J. H. Little, plaintiff, and against Samuel Hazlett, defendant, for the sum of $24,086.61. The facts ascertained by the court and included in its opinion are conceded by the appellant's counsel to be substantially correct. No question of inaccuracy or insufficiency in the facts as found is raised, and on this branch of the case no special consideration is required. It therefore remains to determine whether the court below erred in entering and refusing to take off the compulsory nonsuit. A careful examination and consideration of the decisions relating to the question involved has satisfied us that the court below committed no error in refusing to set aside the compulsory nonsuit, and in determining that no cause of action was shown against Mary E. Brown and Margaret Grayson. We therefore dismiss the assignment of error and base our affirmance of the judgment on the able opinion of the learned court below.

Judgment affirmed.